## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
## FORT WAYNE DIVISION

MICHELLE MILLER,        )
                             )
        Plaintiff,        )
                             )
v.                          )     Cause No. 1:18-CV-173-HAB
                             )
RIVERSIDE RV, INC.,     )
                             )
        Defendant.     )

## OPINION AND ORDER

Plaintiff Michelle Miller ("Michelle") was a shipping coordinator at Defendant Riverside RV, Inc. ("Riverside") for almost two years. For the first eighteen months, Michelle had no apparent performance issues. Then, after a seizure episode on the job, a subsequent two-week medical leave, and reduced hours upon her return, Michelle was fired. Michelle asserts that her firing was the result of discrimination and retaliation, while Riverside claims that she failed to perform her job to its legitimate expectations. Riverside now asks this Court to enter summary judgment in its favor.

### A.    Riverside's Evidentiary Objections

Before addressing the merits of Riverside's summary judgment motion, the Court is compelled to discuss the multiple evidentiary objections lodged by Riverside. These objections take two forms: first, an eight-page, point-by-point objection to the factual recitation in Michelle's summary judgment response, which Riverside placed at the beginning of its reply brief (ECF No. 53 at 2–9); and, second, a motion to strike an affidavit submitted in support of Michelle's response (ECF No. 53).

*1.*       *Riverside's Reply*

The objections in Riverside's reply take two forms: 1) complaints that the "cited testimony" does not support the factual assertion; and 2) disagreements with the inferences drawn from the testimony. Neither is helpful to the Court. Instead, Riverside's objections have wasted time and resources.

The "cited testimony" objections are of particular concern to the Court. On several occasions, Riverside identifies a factual assertion made by Michelle in her response, quotes the evidence cited by Michelle in support of the assertion, and argues that the "cited testimony does not support this statement." (*See*, *e.g.*, ECF No. 52 at 9). The natural inference to draw from Riverside's lengthy evidentiary discussion is that Michelle's assertions are not supported anywhere in the record. This was the inference the Court drew, at least until it reviewed the record in its entirety.

What the Court discovered during its review of the record was that Michelle's assertions were supported in the record, just not in the specific areas she cited. For instance, Michelle cited to her deposition at page 42, line 25 in support of her claim that she discussed her seizures with Ruth Hershberger ("Ruth"), Riverside's Vice President. The correct citation is to page 96, lines 4 through 6. Similarly, Michelle cited to page 109, lines 7 through 11 of her deposition in support of her claim that Merv Lehman ("Merv"), her supervisor at Riverside, called her husband regarding her medical condition. The correct citation is to page 108, lines 22 through 24. There are several more examples of incorrect citations, all identified with excruciating detail by Riverside.

Michelle's counsel should have taken more care in drafting her brief. Incorrect citations do create needless work for the Court. However, these citation errors could have been addressed in a footnote by Riverside. Alternatively, Riverside could have assisted the Court by directing the Court

2

to the correct areas of the record. What Riverside chose to do, effectively multiply the waste of resources by implying that Michelle's facts were entirely without support in the record, was unhelpful. It unnecessarily extended the briefing, forced the Court to check citations on even the most benign points.

Riverside's objections to Michelle's inferences are little more helpful. Take, for instance, Michelle's assertion that Merv "had no issues" with her performance. The cited testimony demonstrates that Merv did develop issues regarding Michelle's performance as it related to "the company's bottom line," but not until after Michelle's termination. The Court has no issue, then, with the representation that Merv had no issues with Michelle's performance during the relevant period; i.e., during her employment. In another instance, Riverside draws the questionable semantic distinction between Merv "giving [Michelle] a chance" and "working with [Michelle] to accommodate" her when she returned from medical leave. In yet another instance, Riverside claims that Michelle "made it up" when she stated that Ruth testified that Michelle "had an attitude." But Ruth testified that "it was a struggle for me to deal with [Michelle], because of not knowing how she would respond to me." (ECF No. 51-7 at 5). Michelle's characterization of this testimony is certainly reasonable.

The Court would not be so concerned about Riverside's conduct if, as noted above, it was contained in a footnote or some other fleeting reference. Instead, Riverside devotes the first nine pages of its sixteen-page reply to these specious evidentiary objections. These objections do nothing to help the Court resolve the issues presented in the motion for summary judgment.

## 2. *Riverside's Motion to Strike*

Riverside's Motion to Strike (ECF No. 53) argues that Michelle's affidavit, submitted in opposition to Riverside's summary judgment motion, should be stricken as a "sham affidavit." The

rule against sham affidavits provides that an affidavit is inadmissible when it contradicts the affiant's previous sworn testimony unless the earlier testimony was ambiguous, confusing, or the result of a memory lapse. *See*, *e.g.*, *Cook v. O'Neill*, 803 F.3d 296, 298 (7th Cir. 2015). The rule is designed to avoid sham factual issues and prevent parties from taking back concessions that later prove ill-advised. *United States v. Funds in the Amount of $271,080*, 816 F.3d 903, 907 (7th Cir. 2016). The Seventh Circuit has emphasized that the rule is to be used with "great caution." *Id*. Thus, where the change is plausible or the party offers a suitable explanation for the change, the changes in testimony go to the witness' credibility rather than admissibility. *Id*.

It is not clear that any of the instances identified by Riverside are the kind of "incredible and unexplained" changes in testimony for which the rule is intended. Like the objections in its reply, many of the identified instances address the interpretation of testimony rather than actual discrepancies. (*See* ECF No. 53 at 3, 4). Others are not discrepancies but instead simply supply additional information. (*Id*. at 2). In others, the affidavit testimony may contradict the cited testimony but it is arguably supported by other testimony. (*Id*. at 3). Even Riverside concedes that, rather than contradicting Michelle's deposition, much of her affidavit "simply restates Plaintiff's deposition testimony, but presents that testimony in a way more favorable to her than what she testified." (*Id*. at 4).

Riverside disagrees with the facts set forth in Michelle's affidavit; in its most incredible argument, Riverside argues that the affidavit should be stricken because it conflicts with Merv's testimony. (*Id*.). But disagreement, no matter how vehement, is not a legal basis to strike testimony. In any event, because the Court can distinguish which exhibits, affidavits, and statements may properly be considered when deciding whether summary judgment is appropriate, the Court denies

Riverside's Motion to Strike. The Court has noted Riverside's objections and will consider the objections to the extent they arise in the Court's summary judgment analysis.

**B.      Factual Background**

Michelle began working at Riverside on July 25, 2015, as a shipping coordinator. Her duties were to ship RVs to dealerships and to arrange shipment with transport companies. For most of her employment, the designated evidence demonstrates that Michelle was performing her job duties well. She never received a written or verbal warning about her job performance. Her direct supervisor, Merv, had no issues with Michelle's performance at any time during her employment with Riverside.

In December 2016, Michelle began suffering from seizures. Her condition limited her ability to speak and drive, and further affected her cognitive abilities. The medication she took for her condition affected her memory, work pace, and eyesight, and caused fatigue.

Michelle did not keep her condition a secret; she testified that she talked to almost everyone in Riverside's office about her condition, including Merv and Ruth. On January 13, 2017, Michelle gave Merv a doctor's note stating that she was being treated for a neurological condition. Michelle asked Merv if Riverside needed any additional information regarding her condition and Merv responded that it was not necessary. Prior to her eventual leave, Michelle requested three total days off work as a result of her condition.

On January 23, 2017, Michelle had a seizure episode at Riverside. Merv observed Michelle walking around Riverside's parking lot in a disoriented state and became concerned about her condition. Merv sent Michelle home, directing another Riverside employee to drive Michelle out of a concern for her ability to drive. Merv also contacted Michelle's husband to tell him that Michelle had been sent home and that Michelle was being put on leave. Michelle was off work

from January 23, 2017, through February 5, 2017, as a result of her condition, spending three of those days in the hospital.

Ruth covered Michelle's job duties during the approximately two-week leave. According to Ruth, she discovered several problems with Michelle's performance during that period. The "yard count," the number of RVs waiting for shipment, was "really high." (ECF No. 41 at 4). Ruth was able to reduce the yard count by 33% during Michelle's leave.[1] Ruth also learned that Michelle "struggled in her relationships with transport companies." (*Id*.). Keith Hershberger ("Keith"), President of Riverside and Ruth's husband, also heard third-hand information that a transport driver liked Ruth but not Michelle. (*Id*.).

Michelle's return to work was not the result of her condition improving. Instead, Michelle became concerned for her job after learning from her daughter (who also worked at Riverside) that a number of changes were occurring at the company. When Michelle returned to work on February 6, 2017, she asked Merv if Riverside needed additional medical information on her condition, and Merv again said that no additional information would be necessary.

Michelle's work schedule was at least nominally reduced when she returned, as she officially worked from 10:00 a.m. to 3:00 p.m. However, Michelle found that she had additional duties when she returned, including a directive from Ruth that Michelle write down every step of her job. As a result, Michelle ended up working *more* hours, including at least one nine-hour day. When confronted about working more than her reduced work schedule, Michelle expressed to Ruth and Merv that she would need to work additional hours to finish her work. According to Michelle, Merv responded that he would have to check with her husband because he did not want to interfere with Michelle's home responsibilities.

---

[1] Riverside does not provide any firm numbers for the yard count at any relevant time. Accordingly, the Court does not know whether Ruth reduced the count from 300 to 200, from 3 to 2, or anything in between.

Even after she returned, Michelle continued to suffer from her seizure condition. Michelle missed two days the week she returned and had to leave early on another day. In total, Michelle missed part or all of seven days from February 6, 2017, through March 30, 2017.

About one week prior to her termination, Michelle and Merv had a conversation about Michelle's job. Michelle told Merv that she was concerned that Ruth was setting her up to fail. Indeed, according to Riverside the yard count went back up after Michelle's return despite Ruth expressing the importance of keeping the number down. Merv responded that Michelle's job was not in jeopardy **if her seizures stopped**. In addition, Merv related that he was only giving Michelle a chance because his wife had suffered a stroke and it took Merv's wife a while to get back to normal.

On March 30, 2017, Merv called Michelle into his office and told her she was fired. Merv had been told to fire Michelle by Keith, who had never before or since involved himself in a firing decision at Riverside. When Michelle asked Merv why she was being fired, he told her he didn't know. According to Merv, he did not learn until later about the yard count and transporter relations issues.

**C.     Legal Analysis**

*1.     Summary Judgment Standard*

Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The non-moving party must marshal and present the Court with evidence on which a reasonable jury could rely to find in their favor. *Goodman v. Nat'l Sec. Agency, Inc.*, 621 F.3d 651, 654 (7th Cir. 2010). A court must deny a motion for summary judgment when the nonmoving party presents admissible evidence that creates a genuine issue of material fact. *Luster v. Ill. Dep't*

*of Corrs.*, 652 F.3d 726, 731 (7th Cir. 2011) (citations omitted). A court's role in deciding a motion for summary judgment "is not to sift through the evidence, pondering the nuances and inconsistencies, and decide whom to believe. The court has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Waldridge v. Am. Heochst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994).

Facts that are outcome determinative under the applicable law are material for summary judgment purposes. *Smith ex rel. Smith v. Severn*, 129 F.3d 419, 427 (7th Cir. 1997). Although a bare contention that an issue of material fact exists is insufficient to create a factual dispute, a court must construe all facts in a light most favorable to the nonmoving party, view all reasonable inferences in that party's favor, *Bellaver v. Quanex Corp.*, 200 F.3d 485, 491–92 (7th Cir. 2000), and avoid "the temptation to decide which party's version of the facts is more likely true," *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003). Additionally, a court is not "obliged to research and construct legal arguments for parties, especially when they are represented by counsel." *Nelson v. Napolitano*, 657 F.3d 586, 590 (7th Cir. 2011).

## 2.    *ADA Claims*

The ADA prohibits employers from discriminating against a "qualified individual" on the basis of his disability. 42 U.S.C. § 12112(a). To prove a claim of disability discrimination, Michelle "must show that: (1) [s]he is disabled; (2) [s]he is otherwise qualified to perform the essential functions of the job with or without reasonable accommodation; and (3) the adverse job action was caused by h[er] disability." *Monroe v. Ind. Dep't of Transp.*, 871 F.3d 495, 503 (7th Cir. 2017) (citing *Roberts v. City of Chi.*, 817 F.3d 561, 565 (7th Cir. 2016)). The language of the ADA requires proof of "but for" causation. *See Silk v. Bd. Of Trs.,Moraine Valley Cmty .Coll,.Dist. No. 524*, 795 F3d 698, 705-06 (7th Cir. 2015).

Discrimination claims may be reviewed on summary judgment under the direct or the burden-shifting methodologies created by *McDonnell Douglas. v. Green*, 411 U.S. 792 (1973). *See David v. Bd. of Trs. of Cmty. Coll. Dist. No. 508*, 846 F.3d 216, 224 (7th Cir. 2017); *Smith v. Chicago Transit Auth.,* 806 F.3d 900, 905 (7th Cir. 2015) (noting the *McDonnell Douglas* framework is just "a formal way of analyzing a discrimination case when a certain kind of circumstantial evidence – evidence that similarly situated employees not in the plaintiff's protected class were treated better – would permit a jury to infer discriminatory intent."). When a plaintiff responds to a motion for summary judgment on an intentional discrimination claim by relying on the burden-shifting framework created by *McDonnell Douglas* a court should assess the case in those terms. *Id.*; *see also Ferrill v. Oak-Creek-Franklin Joint Sch. Dist.*, 860 F.3d 494, 499 (7th Cir. 2017) (noting that *McDonnell Douglas* burden-shifting analysis has not been displaced); When the plaintiff does not present his argument in opposition to summary judgment in those terms, the direct method of proof is the "default rule." *Bagwe v. Sedgwick Claims Mgmt. Servs., Inc.*, 811 F.3d 866, 880 (7th Cir. 2016) (quoting *Morgan v. SVT, LLC*, 724 F.3d 990, 997 (7th Cir. 2013)). Under that method, the test for whether a claim of intentional discrimination should proceed to a jury is whether the admissible evidence, considered as a whole, would permit a reasonable factfinder to conclude that the plaintiff's disability caused the adverse action.

In all cases, the question at summary judgment remains: "has the non-moving party produced sufficient evidence to support a jury verdict of intentional discrimination?" *David*, 846 F.3d at 224; *see also See Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016) (instructing courts to stop separating "direct" from "indirect" evidence and instructing, instead, that the test is "simply whether the evidence would permit a reasonable factfinder to conclude the plaintiff's [protected status] caused the discharge or other adverse employment action). *Liu v.*

9

*Cook Cty.*, 817 F.3d 307, 315 (7th Cir. 2016) ("The proper question under either method is simply whether a reasonable trier of fact could infer retaliation or discrimination."); *Bass v. Joliet Pub. Sch. Dist. No. 86*, 746 F.3d 835, 840 (7th Cir. 2014) ("[T]he fundamental question at the summary judgment stage is simply whether a reasonable jury could find prohibited discrimination."). Michelle has not invoked the *McDonnell Douglas* framework.  Regardless of whether the evidence is considered under the *McDonnell Douglas* framework or another framework, the evidence is sufficient to permit a reasonable factfinder to conclude that Michelle's disability was the reason for her termination.

Riverside argues that Michelle has failed to establish genuine issues of material fact as to all three of the elements of her ADA claim. The Court will address each in turn. The ADA defines "disability" as "a physical or mental impairment that substantially limits one or more major life activities of such individual." 42 U.S.C. § 12102(1)(A). The term is to be construed "in favor of broad coverage of individuals under this chapter, to the maximum extent permitted by the terms of this chapter." 42 U.S.C. § 12102(4)(A). While Riverside is correct in pointing out the relative lack of documents supporting Michelle's disability claims, and is further correct in noting that Michelle is a less-than-reliable historian with respect to the course of her condition, the Court concludes that Michelle has designated sufficient evidence to create, at the very least, a genuine question of material fact as to her disability. There does not appear to be a genuine dispute as to whether Michelle suffers from seizures. Indeed, Riverside gave Michelle two weeks off because of her seizures. Michelle testified that her condition limited her ability to speak and drive, and further affected her cognitive abilities. The medication she took for her condition affected her memory, work pace, and eyesight, and caused fatigue. The Court concludes that this testimony is enough to survive summary judgment.

Riverside further challenges the allegation that Michelle was a "qualified individual" for the purposes of the ADA. The determination of whether an individual is a qualified individual requires a two-part analysis. First, the individual must meet the employer's "legitimate selection criteri[a]." *Hammel v. Eau Galle Cheese Factory*, 407 F.3d 852, 862 (7th Cir. 2005). This means that the individual must be qualified on paper by, for example, possessing "the requisite skill, experience, education and other job-related requirements of the employment position" at issue. 29 C.F.R. § 1630.2(m). Riverside does not challenge Michelle's qualification under the first part of the analysis.

Riverside makes its challenges on the second part of the analysis, which requires that the individual must be "capable of performing the job's 'essential functions' with or without a reasonable accommodation from an employer." *Hammel*, 407 F.3d at 862. First, Riverside asserts that Michelle cannot be a qualified individual because she admits that she cannot perform the essential functions of her position without accommodations. (ECF No. 52 at 13). This argument demonstrates a fundamental misunderstanding of the ADA. The second part of the analysis encompasses two categories of paper-qualified individuals with disabilities: those who are able to perform the essential functions of the job even without reasonable accommodation, and those who could do so if the employer were to make an accommodation for their physical or mental limitations. *Brumfield v. City of Chi.*, 735 F.3d 619, 632 (7th Cir. 2013). An individual who falls into either category is a "qualified individual;" an individual need not fall into both. *Bultemeyer v. Fort Wayne Cmty Schs.*, 100 F.3d 1281, 1285 (7th Cir. 1996) (noting that a plaintiff "may have been qualified, because he may have been able to perform the essential functions of the job *with reasonable accommodation*.") Michelle's admission that she could not perform her job without an accommodation is little more than an admission that she does not fall into the first category.

11

Riverside also disputes Michelle's ability to perform her job even with a reasonable accommodation. But how would Riverside know? To be sure, when Michelle returned to work, she was given a reduced work schedule, a recognized accommodation under the ADA. 29 C.F.R. § 1630.2(o)(2)(ii). However, at the same time it was allowing Michelle to work a reduced schedule, Riverside was also assigning her additional tasks. Michelle testified that, upon her return, Ruth required that Michelle write down her job duties step-by-step, and further required Michelle to teach another employee (Michelle's daughter) about accounts receivable. (ECF No. 51-1, Dep. of M. Miller p. 123, ll. 1–18). These additional tasks made it impossible for Michelle to perform her work duties during the reduced hours, eventually forcing Michelle to request permission to go back to working full time. (*Id.*, p. 116, ll. 21–22). The designated evidence shows that Riverside undermined the accommodation from the very start, and ultimately prevented Michelle from demonstrating that she could perform her job with a reasonable accommodation. *Bultemeyer*, 100 F.3d at 1285. On these facts, the Court concludes that a genuine issue of material fact exists as to whether Michelle was a qualified individual under the ADA.

Finally, Riverside claims that Michelle's post-employment application for Social Security benefits bars her ADA claim because it demonstrates that she was unable to work at the time of her termination. In support of its position, Riverside cites to the United States Supreme Court's decision in *Cleveland v. Policy Management Systems Corp.*, 526 U.S. 795 (1999). As Riverside notes, the Supreme Court held that "an ADA plaintiff cannot simply ignore the apparent contradiction that arises out of the earlier SSDI total disability claim. Rather, she must proffer a sufficient explanation." *Id.* at 806. However, the Court also made it clear that there are any number of explanations that might suffice, stating "there are too many situations in which an SSDI claim and an ADA claim can comfortably exist side by side." *Id.* at 802–03. The Social Security Act

("SSA") and the ADA have different legal standards for disability. *Id*. at 803–04. The SSA permits individuals to work and collect benefits under certain conditions. *Id*. at 805. In addition, an SSA claim and an ADA claim can be simply a form of pleading in the alternative. *Id*. And, most relevant to this case, "the nature of an individual's disability may change over time, so that a statement about that disability at the time of an individual's application for SSDI benefits may not reflect an individual's capacities at the time of the relevant employment decision." *Id*.

Here, Michelle notes that the SSA application was not made until six months after her termination. (ECF No. 51-2 at 5). The Court has no additional information regarding her application, so it cannot determine when Michelle claimed that her disability began or the nature of the claimed disability. Given the time period between her termination and her SSA application, the Court concludes that, consistent with *Cleveland*, Michelle has done enough to survive summary judgment.

The foregoing notwithstanding, Riverside argues that Michelle was terminated because she was not performing to Riverside's legitimate expectations. Riverside identifies two reasons for Michelle's termination: her failure to keep the yard count low and her relationships with transport companies.[2] Given the lack of evidence supporting these reasons, the Court finds that genuine issues of material fact exist as to whether Riverside's purported reasons are worthy of credence. As such, the Court finds that there is sufficient evidence in the record for a reasonable jury to find that Riverside's reasons were pretextual.

---

[2] Riverside discusses these reasons in the context of proving that Michelle was not performing to their legitimate expectations. This is a prong of the *McDonnell Douglas* test. *Santangelo v. Crown Cork & Seal USA, Inc.*, 255 F. Supp. 3d 791, 801 (N.D. Ill. 2017). As noted above, Michelle has not invoked this test. Accordingly, the Court will analyze the proposed bases in terms of deciding whether Michelle has produced sufficient evidence to support a jury verdict of intentional discrimination. *David*, 846 F.3d at 224

In order to be pretextual, the employer's proffered reason must be a "lie." *Burks v. Wis. Dep't of Transp.*, 464 F.3d 744, 754 (7th Cir. 2006). The Court is not concerned with whether the employer's actions were "mistaken, ill considered or foolish, so long as the employer honestly believed those reasons." *Id.* (quoting *Jordan v. Summers*, 205 F.3d 337, 343 (7th Cir. 2000)).

First and foremost, Michelle presents one of the rare cases where there is direct evidence of discrimination. Direct evidence of discrimination is "evidence which in and of itself suggests that someone with managerial authority was animated by an illegal employment criterion." *Joyce v. Chi. Park Dist.*, 483 F. Supp. 2d 678, 683 (N.D. Ill. 2007) (quoting *Sheehan v. Dolen Corp.*, 173 F.3d 1039, 1044 (7th Cir. 1999)). Here, Michelle testified that one week prior to her termination she was told by Merv that her "job was fine as long as [her] seizure symptoms went away." (ECF No. 51-1, Dep. of M. Miller p. 92, ll. 17–20). Given the proximity in time between this statement and her termination, and the fact that Merv was Michelle's direct supervisor, the Court finds that a reasonable jury could conclude, based on this statement, that Michelle's termination was prompted by her disability regardless of the reasons advanced by Riverside.

Second, the weakness of Riverside's reasons for termination give rise to the specter of pretext. Riverside has submitted virtually no evidence in support of its proposed reasons for Michelle's termination. With respect to the yard count, Riverside's explanation is so lacking in detail as to be useless. The entirety of Riverside's evidence with respect to the yard count is that the yard count was "really high" when Ruth took over during Michelle's leave, that Ruth was able to reduce the yard count by one-third, and that the yard count went back up when Michelle returned. Riverside does not explain what it means for the yard count to be "really high." Was this 10% higher than normal? 50%? 500%? For that matter, what was a normal yard count? Why was the yard count "really high"? How was Ruth able to get the yard count down? Did she change the

14

way the office was run, or was the reduction coincidental? Was there a particularly large order that reduced the yard count? And why did the yard count go back up when Michelle returned? What was the yard count when Michelle came back and when she was terminated? Was the increased yard count the result of something Michelle had done (or failed to do), or was it the result of a decrease in orders?[3] None of these questions are answered by Riverside's evidence. This utter lack of explanation leads the Court to conclude that even if a reasonable trier of fact could credit Riverside's proffered reason, genuine disputes remain as to whether it is worthy of credence.

Michelle's relationships with transport companies fares no better. The closest Riverside comes to designating evidence that Michelle had poor relationships with transport companies is Keith's double-hearsay testimony he was told that some unidentified driver told Keith's brother-in-law that the driver didn't like Michelle. This is not admissible evidence. Fed. R. Evid. 805. Even if it was, it establishes at most that one driver didn't like Michelle. This is a far cry from Michelle having relationships with transport companies that were so bad as to constitute a reason for termination, even if Riverside believed the report.

Michelle has also provided the Court with evidence from which reasonable inferences of discrimination could be drawn. The job deficiencies identified by Riverside did not appear until Michelle took the two-week leave as a result of her disability. There is no record before the Court of any prior discipline, unfavorable reviews, or any other indication that Michelle's performance was anything other than acceptable prior to January 23, 2017. Merv, Michelle's direct supervisor,

---

[3] Although not addressed by either party, the Court finds that Michelle's deposition answers some of these questions. The discrepancy in the yard count numbers under Michelle and Ruth appears to stem from a difference in when the units were shipped vis-à-vis the transaction process. According to Michelle, the reason that the yard count was high when she went on leave was that there were "a lot of units out there that did not have bank approval." (ECF No. 51-1, Dep. of M. Miller, p. 145, ll. 17–23). Bank approval, that is, approval from the bank for the dealership receiving the units, was a prerequisite for Riverside to be paid. When Ruth took over, she began shipping units without bank approval. (*Id.* at 144, ll. 5–10). It also appears that Ruth sent some units to an off-site storage yard. (*Id.* at p. 144, ll. 11–24). Therefore, to the extent that Ruth was able to reduce the yard count, that reduction was artificial.

never raised any concerns about her performance, to the point that he did not know why she was being terminated. Moreover, Ruth, who is the one who identified the claimed deficiencies, did not raise any prior concerns despite having filled in for Michelle in the past. (ECF No. 51-7, Dep. of R. Herschberger, p. 8, ll. 9–13). While it is true that the Court must examine Michelle's performance at the time of her termination, *Stern v. St. Anthony's Health Ctr.*, 788 F.3d 276, 287 (7th Cir. 2015), it is certainly reasonable to assume that the kind of systemic failures identified by Riverside would have been evident to someone at some point prior to Michelle's disability if, in fact, they actually existed.

Riverside's conduct upon Michelle's return could also lead to an inference of discrimination. Upon her return, Michelle was put on a reduced work schedule but was given more work. This effectively assured that Michelle would be unable to complete her job duties within the time allotted. One would also reasonably assume, if Michelle's procedures had resulted in adverse consequences for Riverside, she would have been told to change those procedures upon her return. To the contrary, Ruth told Michelle to continue the same procedures Michelle had utilized prior to her leave. (ECF No. 51-1, Dep. of M. Miller, p. 128, ll. 1–7). It is also worth noting that all these procedures were reviewed and approved by Ruth before they were put into place. (*Id.*, p. 146, ll. 13–18).

The way the termination occurred also could give rise to an inference of discrimination. *See Futrell v. J.I. Case*, 38 F.3d 342, 349 (7th Cir. 1994). The designated evidence in this case is that Keith has never, before or after, involved himself in a termination decision. Yet, Keith testified that he was the one who made the decision to fire Michelle. (ECF No. 51-6, Dep. of K. Herschberger, p. 10, ll. 11–15; p. 17, ll. 8–12). The only explanation Keith gave for this discrepancy is the fact that he spoke to Ruth and Merv regarding Michelle. But this explanation

makes little sense given Merv's testimony that he didn't know the reason for Michelle's firing until well after the termination. It also does not explain why Keith made the decision in *this* case, given his testimony that he regularly spoke with managers "to find out what's going on" but still permitted those managers to make decisions. (*Id*. at p. 9, l. 22 – p. 10, l. 2). Michelle's firing appears to have been a significant departure from Riverside's regular procedures, *see Bagwe v. Sedgwick Claims Management Services, Inc.*, 811 F.3d 866, 882 (7th Cir. 2016), and, given all the other evidence set forth above, could result in a finding of discrimination.

In summary, the Court finds that Michelle has designated more than enough evidence to permit a reasonable jury to find a violation of the ADA. A jury may ultimately choose to reject Michelle's evidence, or Riverside may present more evidence at trial, but at this point it is clear to the Court that this case should go to a factfinder to resolve the parties' factual disputes. As such, Riverside's request for summary judgment with respect to Michelle's ADA claim will be denied.

### 3.    Title VII Claims

The Court agrees with Riverside that, by failing to respond to Riverside's request for summary judgment on her Title VII claims, Michelle has abandoned those claims. *See Palmer v. Marion Cty.*, 327 F.3d 588, 597 (7th Cir. 2003). Accordingly, the Court will grant Riverside's request for summary judgment with respect to Count I of Michelle's complaint.

### 4.    FMLA Claims

The FMLA entitles an eligible employee up to twelve work weeks of leave during a twelve-month period where the employee has a serious health condition that renders him unable to perform the functions of his position. 29 U.S.C. § 2612(a)(1)(D). The Act makes it unlawful for an employer "to interfere with, restrain, or deny the exercise" of a right created by the FMLA. *Id.* at § 2615(a)(1). An FMLA interference claim requires only that an employee "show that his employer

deprived him of an FMLA entitlement; no finding of ill intent is required." *Burnett v. LFW, Inc*., 472 F.3d 471, 477 (7th Cir. 2006). Specifically, an employee must show:

> (1) he was eligible for the FMLA's protections, (2) his employer was covered by the FMLA, (3) he was entitled to leave under the FMLA, (4) he provided sufficient notice of his intent to take leave, and (5) his employer denied him FMLA benefits to which he was entitled.

*Burnett*, 472 F.3d at 477.

An employer's failure to comply with either the statutory or regulatory requirements of the FMLA constitutes interference, 29 C.F.R. § 825.220(b), if the employee can show "some impairment of his rights and resulting prejudice." *Barrett v. Ill. Dep't of Corrs*., 803 F.3d 893, 898 (7th Cir. 2016) (citing *Ragsdale v. Wolverine World Wide, Inc*., 535 U.S. 81 (2002)). An employer who violates § 2615 shall be liable for "wages, salary, employment benefits or other compensation denied or lost ... by reason of the violation." 29 U.S.C. § 2617(a)(1)(A)(i)(I).

The FMLA and its implementing regulations require employers to advise employees of their rights under the Act by: (1) posting a general notice of FMLA information and procedures in the workplace, (2) providing an "eligibility notice" to an employee notifying him of his eligibility to take FMLA leave when the employer acquires knowledge that he may qualify, (3) providing a "rights and responsibilities notice" to an employee with written notice of his obligations and the consequences of failing to meet them, and (4) providing a "designation notice" to an employee notifying him that his leave has been designated as FMLA leave and providing the terms of the leave. 29 C.F.R. § 825.300(a)–(d). While general notice can be conveyed by advising the general workplace population, the FMLA requires that the other forms of notice be provided on an individualized basis. *See Conoshenti v. Pub. Serv. Elec. & Gas Co*., 364 F.3d 135, 142 (3d Cir. 2004).

Riverside concedes, for the purposes of summary judgment, that Michelle can establish the first two elements of her FMLA interference claim. Riverside does, however, contest the remaining elements. For the reasons set forth below, the Court finds that the designated evidence entitles Michelle to a trial on the merits of her FMLA interference claim.

An individual is entitled to leave under the FMLA "because of a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D). A "serious health condition" is an "illness, injury, impairment, or physical or mental condition that involves—(A) inpatient care in a hospital, hospice, or residential medical care facility; or (B) continuing treatment by a health care provider." *Id*. at § 2611(11). Riverside's challenge to Michelle's entitlement is based primarily on her lack of documentation. Riverside notes that Michelle has not produced any records from treating physicians or from her claimed hospital stays. While this is true, there is nonetheless evidence in the record that creates a jury issue. Michelle did provide Merv with a doctor's note on January 13, 2017, demonstrating that she was receiving ongoing treatment for a neurological disorder. This note was plain evidence that Michelle had a "physical or mental condition that involves . . . continuing treatment by a health care provider." Michelle offered to provide additional information, but Merv declined. Two weeks later, Riverside put Michelle on leave following an incident where she was found confused and disoriented in the parking lot, a tactic acknowledgement that her condition rendered her unable to perform the functions of her positions. While Michelle may not have provided Riverside with documentation connecting the two evidentiary dots, the Court finds that a reasonable jury could make that seemingly obvious connection. *See Burnett v. LFW, Inc.*, 472 F.3d 471, 478 (7th Cir. 2006) (finding that an individual was entitled to FMLA leave where he had a condition requiring

periodic treatments continuing for an extended period of time that might have caused episodic rather than continuous incapacity).

Riverside next argues that Michelle failed to provide sufficient notice of her intent to take FMLA leave, noting that she never specifically requested FMLA leave or provided documentation from a physician demonstrating entitlement to FMLA leave. (ECF No. 41 at 21–22). Although an employee is not required to refer to the FMLA in order to give notice of her intent to take FMLA leave, "the notice must succeed in alerting the employer to the seriousness of the health condition." *Stevenson v. Hyre Elec. Co*., 505 F.3d 720, 725 (7th Cir. 2007). Calling in sick without providing additional information does not provide sufficient notice under the FMLA. *Burnett*, 472 F.3d at 479; *Collins v. NTN–Bower Corp*., 272 F.3d 1006, 1008 (7th Cir. 2001) ("'Sick' does not imply 'a serious health condition.'"). This is true even if the employee provides her employer with a doctor's note if the note does not convey the seriousness of her medical condition. *See Phillips v. Quebecor World RAI, Inc*., 450 F.3d 308, 311–12 (7th Cir. 2006).

The obvious problem with Riverside's argument is that, regardless of the content of Michelle's notice, Riverside gave Michelle two weeks of leave due to her medical condition. Riverside was able to observe Michelle's condition and conclude that she needed medical leave. Thus, while Michelle's doctor's note may or may not have put Riverside on notice of the seriousness of her condition, Riverside was able to make that determination on its own. This case presents a situation, then, where circumstances provided Riverside with sufficient notice of the need for medical leave independent of any notice from Michelle. *Burnett*, 472 F.3d at 479 ("In certain instances, however, an employer is obligated to provide medical leave even though an employee has failed even to say he is sick.").

Finally, Riverside argues that it did not interfere with Michelle's FMLA rights because it provided her with the two week leave. However, Riverside designated no evidence suggesting that it provided Michelle with the information required by FMLA's regulations.[4] 29 C.F.R. § 825.300(a)–(d). In addition, Michelle testified that Merv expressly rejected her request for FMLA leave in February 2017, telling her it was "too late." (ECF No. 51-1, Dep. of M. Miller, 9. 129, ll. 12–24). While Riverside claims that Merv never made this statement, the Court cannot resolve this dispute at this stage of the litigation and must consider the facts most favorable to Michelle. At this point, then, there is enough evidence in the record to create a jury question regarding Michelle's FMLA interference claim.

## 5.    *Retaliation Claims*

Finally, in a quarrel befitting the parties' interactions throughout this case, there is a vehement disagreement as to whether Michelle alleged claims for retaliation under the ADA and FMLA. This dispute focuses on paragraph 46 of Michelle's complaint, where she alleges that "[t]he Defendant retaliated against Ms. Miller due to her disability and need to take associated leave." (ECF No. 3 at 6). Michelle claims this allegation was enough to put Riverside on notice of her claim, while Riverside claims that the failure to include a numbered count for retaliation, as well as Michelle's failure to allege protected activity, render the complaint deficient.

"[A] plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above the speculative

---

[4] Riverside appears to argue, without citation to authority, that it did not need to provide the required information because Michelle was aware of FMLA, having taken leave under the Act at a prior job while she was pregnant. (ECF No. 41 at 21). The legal merits of this claim aside, the factual predicate is incorrect. Michelle's testimony, when pressed by Riverside's attorney about her pregnancy leave, was "I don't know that I knew it was FMLA. I just knew that, like, when I was pregnant, I knew I could take time off around that." (ECF No. 51-1, Dep. of M. Miller, p. 93, ll. 14–20).

level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 554 555 (2007) (citations omitted). A complaint need only provide notice of a plausible claim; there is no rule requiring parties to plead legal theories or elements of a case. *Auto Driveaway Franchise Sys., LLC v. Auto Driveaway Richmond, LLC*, 928 F.3d 670, 675 (7th Cir. 2019).

Here, Michelle's complaint included more than forty paragraphs of factual allegations detailing her version of her disability and termination. Near the end of those allegations is paragraph 46. Paragraph 46 alleges, in no uncertain terms, that Riverside retaliated[5] against Michelle due to her disability and need for leave. The Court concludes that the facts, as pled, constituted a "short and plain statement of the claim," Fed. R. Civ. P. 8(a)(2), and put Riverside on notice of the claims against it.

This is not to say that Michelle's complaint is a model of clarity. As Riverside correctly notes, Michelle specifically set out her claims under the ADA, Title VII, and FMLA in numbered counts, none of which identified a claim for retaliation. The Court can see how this inconsistent pleading style could result in confusion. Thus, while Michelle is correct that Riverside failed to address the retaliation claims in its motion for summary judgment, the Court finds that this failure can be excused.

This is also not to say that Michelle's retaliation claims appear particularly strong. There is certainly some inconsistency between Michelle's allegations that she was denied accommodations and FMLA leave and her allegations that she was retaliated against for exercising her rights under the ADA and FMLA. However, the retaliation claims were not the focus of either party's briefing or designation of evidence, and the Court may have an incomplete understanding

---

[5] Riverside is correct that Michelle did not allege that she was engaged in protected activity. However, engagement in protected activity is an element of a retaliation claim, *Sanford v. Thor Indus., Inc.*, 286 F. Supp. 3d 938, 948 (N.D. Ind. 2018), and the law is clear that elements of a claim need not be pled.

of the bases for the retaliation claim and the defenses. Therefore, while the Court will deny the motion for summary judgment with respect to the retaliation claims, it will do so without prejudice to enable Riverside to seek summary judgment on those claims should it determine that such a motion is warranted.

**D.     Conclusion**

For the foregoing reasons, Riverside's Motion for Summary Judgment (ECF No. 40) is GRANTED as to Michelle's Title VII claims. The Motion for Summary Judgment is DENIED in all other respects. Riverside's Motion to Strike Plaintiff's Exhibit B (ECF No. 53) is also DENIED.

SO ORDERED on April 23, 2020.

 s/ Holly A. Brady
JUDGE HOLLY A. BRADY
UNITED STATES DISTRICT COURT